# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Vaughn*, 2011 IL App (1st) 092834

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC VAUGHN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-2834 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | September 30, 2011<br><br>November 16, 2011<br>November 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for multiple counts of criminal sexual assault, sexual abuse and sexual relations within families arising from incidents involving his daughter were upheld over his contentions that the State failed to prove one conviction in which defendant's admission was not corroborated independently, that the State failed to prove defendant committed the acts of criminal sexual assault by the use or threat of force, and that defendant's counsel was ineffective in failing to move to suppress defendant's inculpatory statements, but the mittimus was corrected to reflect 707 days of credit for presentence detention. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-21925; the Hon. Clayton J. Crane, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Yvette Loizon, Tasha-Marie Kelly, and Charles J. Prochaska, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE LAMPKIN delivered the judgment of the court, with opinion. Justices Cahill and Garcia concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant, Eric Vaughn, was convicted of 56 counts of criminal sexual assault, sexual abuse, and sexual relations within families as a result of two incidents involving defendant's 14-year-old daughter, T.V. The counts were later merged into six convictions for which defendant was sentenced to a total of 30 years' imprisonment. On appeal, defendant contends: (1) the State failed to prove one of the convictions beyond a reasonable doubt where defendant's admission was not corroborated independently; (2) the State failed to prove beyond a reasonable doubt that defendant committed the acts of criminal sexual assault by the use of force or the threat of force; (3) defense counsel was ineffective for failing to file a motion to suppress defendant's inculpating statements; and (4) defendant is entitled to 707 days of presentence detention credit. Based on the following, we affirm.

¶ 2                                      FACTS

¶ 3    At trial, T.V. testified that she was 14 years old at the relevant time. On September 3, 2007, T.V. was visiting defendant.[1] They, along with T.V.'s brother and defendant's girlfriend, had been shopping for school clothes and had returned to defendant's home for a sleepover. Defendant lived with his girlfriend. At some point, T.V. went to sleep. She was wearing a t-shirt and boxer shorts. T.V.'s brother was also asleep in the same bed. T.V. later awoke and found defendant was between her legs with his mouth on her vagina. T.V. noticed that her shirt had been pulled up over her head and her shorts had been removed. T.V. testified that she was scared. Defendant then inserted his finger into her vagina and inserted his penis into her vagina as well. T.V. added that defendant's penis made contact with her anus.

¶ 4    The following morning, defendant asked T.V. if she liked what had occurred the prior

---

[1]T.V. lived with her mother, but saw defendant on a regular basis.

night. T.V. refused to answer. Defendant then told T.V. that she was his special girl and that if she told anybody about the incident he would kill her. Defendant and T.V. were alone during the conversation. T.V. did not tell anyone about the incident.

¶ 5     On September 14, 2007, T.V. again spent the night at defendant's home. The purpose of the visit was for defendant to take T.V. to get contact lenses; however, the store was closed, so they planned to have a sleepover. That night, T.V. fell asleep in the same bed as her brother, wearing a t-shirt and boxer shorts. T.V. again awoke and found defendant between her legs with his mouth on her vagina. T.V. continued to lie on the bed while defendant had his mouth on her vagina for 30 minutes. T.V. testified that she was scared at the time. According to T.V., defendant penetrated her vagina and anus with his penis. T.V. did not scream; however, she squirmed and attempted to turn from defendant penetrating her, but defendant continued to "com[e] back" and "do it again." T.V. could not recall whether defendant ejaculated.

¶ 6     The following morning, T.V. returned to her mother's house and told her best friend about the incidents, adding that she was afraid to inform her mother. At approximately 11 p.m. that night, T.V. told her mother, Shaunta Douglas, about the incidents. T.V. was crying when she reported what had occurred. Douglas called the police. The officer that responded to the call advised Douglas to take T.V. to the hospital. Douglas took T.V. to Mount Sinai Hospital. While at the hospital, T.V. spoke with a nurse and a doctor, separately telling them about the incidents. T.V. was examined by the doctor.

¶ 7     Sharlene Rivera testified that she was a registered nurse who interviewed T.V. and assisted in the sexual assault examination on September 16, 2007. According to Rivera, T.V. reported that "she was raped by her father on two occasions, on September 3 and September 15," and that she was penetrated vaginally and anally and that defendant licked her vagina. Rivera assisted in performing the rape kit examination.[2] On cross-examination, Rivera said T.V. only stated that defendant put his penis in her vagina and licked her vagina.

¶ 8     Doctor Michael Slater examined T.V. on September 16, 2007. T.V. told Dr. Slater that defendant performed oral sex on her and inserted his penis into her vagina. Dr. Slater's physical examination did not reveal any physical injury or vaginal trauma. Dr. Slater testified that this was normal because generally there is no injury inflicted on a sexual assault victim that has engaged in intercourse prior to the attack.

¶ 9     Detective Ian Barclay was assigned to investigate the incidents. At approximately 7:45 a.m. on September 27, 2007, Barclay and his partner, Detective Morris, arrested defendant at his workplace and transported him to the 11th district police station. At approximately 8:30 a.m., defendant was advised of his *Miranda* rights. Defendant stated that he understood his rights. At 4 p.m. or 5 p.m., Barclay interviewed defendant. Defendant was readvised of his *Miranda* rights. Defendant waived his rights and provided an oral statement. Defendant said that he touched T.V.'s breast with his hand. Defendant continued that, on September 3, 2007, he penetrated T.V.'s vagina with his finger and penis and kissed her vagina with his

---

[2]The parties stipulated that the vaginal swabs collected with the rape kit did not contain semen or saliva.

mouth. Defendant added that the incident occurred after his girlfriend received a phone call and left their home. Defendant further said that, on September 14, 2007, he forced T.V.'s legs apart by virtue of his weight and size and kissed her vagina. On the second date at issue, defendant also penetrated T.V.'s vagina and held his arm around her. The incident lasted approximately 30 minutes. After the interview concluded, Detective Barclay called the State's Attorney's office.

¶ 10    Assistant State's Attorney (ASA) Martha Kross arrived at the police station at approximately 8 p.m. on September 27, 2007. ASA Kross testified that defendant waived his *Miranda* rights and agreed to provide an oral statement. Defendant admitted that he fondled T.V.'s breast and vagina and attempted to put his penis into her vagina during the first incident. Defendant further admitted that he fondled T.V.'s breast and vagina, kissed her vagina, placed his finger into her vagina, and penetrated her vagina and anus with his penis during the second incident. Defendant then agreed to have his statement memorialized in writing. Defendant signed each page of the statement. Defendant instructed ASA Kross to make a number of corrections to the statement, which he then initialed.

¶ 11    Defendant's statement was read into the record. The statement related to the September 3 incident provided:

"Eric states that [his girlfriend] got a call and left the house with her daughter. Eric states that he then went into the bedroom where [T.V. and her nine-year-old brother D.V.] were. Eric states that [D.V.] was [asleep]. Eric states that [T.V.] [was] also asleep. Eric states that he laid on the bed with [T.V.] Eric states that he fondled [T.V.] on her breast under her t-shirt. Eric states that he then fondled [T.V.]'s vagina over her underwear. [Eric] then states that he pulled [T.V.'s] underwear drown [*sic*] and kissed on her vagina. Eric states that he got on top of [T.V.] and tried to place his penis into her vagina. He stated [he] did not get his penis all the way inside [T.V.]'s vagina because he started to feel bad about what was happening. He states he got up and left the room. Eric states that when he was still in the room, [T.V.] looked at him with a really mean look on her face, then turned her head. Eric states that [D.V.] did not wake up."

In relation to the September 14 incident, defendant's statement provided:

"Eric states that he, [T.V.] and [D.V.] were watching a movie together in the bed in the room where [T.V.] and [D.V.] were to sleep. Eric states that [D.V.] fell asleep. Eric states that [he] was laying on the side of [T.V.] with [T.V.]'s back to him. Eric states that he began to fondle [T.V.'s] breasts over and under her shirt. Eric states that he then pulled [T.V.]'s shorts down. Eric states that he pulled his penis out and placed it in the area of her butt. Eric states that [T.V.] started to squirm. Eric states that he held his arm over her body. Eric states that because [T.V.] was squirming, he turned her over. Eric states that he pulled up [T.V.]'s shirt and began to kiss her breast. Eric states that he put his finger into [T.V.'s] vagina. Eric states that he then kissed [T.V.]'s vagina. Eric states he then got on top of her and placed the head of his penis into [T.V.]'s vagina. Eric states that he felt bad again and stopped. Eric states that [T.V.] was mumbling and gave him a mean look again. Eric states that he left and went to his room. Eric states that [D.V.] did not wake up. Eric states that he took both [T.V.] and [D.V.] home on Saturday,

9/15/07. Eric states that on both occasions, he told [T.V.] not to tell anyone and to keep it a secret. Eric states that he is sorry that he did what he did to [T.V.]. Eric states that he knows that he was wrong and that he does not want to do any of these things again. Eric states that he feels really bad and knows he needs help. Eric states that he has been treated well by the police and by ASA Kross. ***. Eric states that no threats or promises had been made to him to get him to give this statement, and he was giving this statement freely and voluntarily. ***. Eric states that he was allowed to make any changes or corrections to his statement and that he put his initials by any change or correction. Eric states everything contained in the statement is true and correct."

¶ 12    After the State rested its case-in-chief, the trial court granted defendant's motion for a directed finding on seven counts,[3] all pertaining to contact between defendant's penis and T.V.'s anus.

¶ 13    Defendant testified that two detectives took him to the police station following his arrest on September 27, 2007. At approximately 9 a.m., one of the detectives informed him of the basis of the arrest. The detective then asked him if he wanted to talk about the situation or make a statement. Defendant testified that he told the detectives he did not want to talk to them at that time. Defendant was then placed in a holding cell for a few hours.

¶ 14    According to defendant, at about 12:30 p.m. or 1 p.m., the detectives returned and asked defendant if he wanted to respond to statements made against him. Defendant was read a statement of T.V.'s accusations. Defendant testified that one of the detectives made him feel "really bad" for what had occurred. Defendant told the detective that "all of this" was because of alcohol and drug addictions. Defendant testified that one of the detectives told him that they would assist him in receiving treatment in jail. Defendant was then returned to the holding cell and told to think about making a statement. According to defendant, "I didn't know about the criminal arrest procedures and stuff at this time because this is my first time going through the, you know, questioning part being arrested."

¶ 15    At about 4 p.m., the detectives returned yet again, and defendant made a detailed statement of the events in question. Defendant testified that when he asked for help obtaining treatment the detectives told him he needed to make a statement in order to receive that help. Defendant "explained to the two detectives that everything in the charges [was] exactly true, but [he] played a majority role in it, and the majority of the charges against [him], [he] played a role in it, but everything wasn't all the way true."

¶ 16    Defendant further testified that he agreed to speak with the ASA and provide a handwritten statement. Defendant testified that some of the statement he provided to the ASA was not true. Defendant did not elaborate as to what portions of the statement were not accurate. Defendant said he did not inform the ASA that portions of the statement were not true. Defendant testified that the detectives were present when he made his statement to the ASA and they repeatedly stopped defendant during the statement when he attacked the veracity of the statement, stating, "no, well, this is what the statement is saying that you did." According to defendant, he agreed with the statement and signed it because he wanted to

---

[3]Counts IV, V, VI, XIV, XVIII, L, and LXXVIII.

-5-

receive treatment.

¶ 17　　On cross-examination, defendant admitted he told the detectives he committed some of the crimes because it was the truth. Moreover, defendant testified that "most" of the statement taken by the ASA was true and that he made corrections to the statement. Defendant admitted that on September 3, 2007, he fondled T.V.'s breast, kissed her vagina, and inserted his finger into her vagina. Defendant initially stated that his penis did not have contact with T.V.'s vagina on that date, but later during cross-examination admitted having contact between his penis and T.V.'s vagina on September 3, 2007. Defendant, however, denied threatening T.V.'s life if she told her mother about the incident. Defendant further admitted that on September 14, 2007, he fondled T.V.'s breasts, removed T.V.'s boxer shorts, placed his head between T.V.'s legs, kissed her vagina, placed his finger in her vagina, got on top of T.V. while he had an erection, held his arm around T.V., and made contact with her vagina with his penis in an attempt to have sexual intercourse. Defendant, however, denied telling the detectives that he forced T.V.'s legs open with his weight or that he had sexual contact with her for 30 minutes. Defendant clarified that his girlfriend received the phone call and left the house on September 14, 2007, not September 3, 2007, as it was reported in his handwritten statement. Defendant testified that the detectives promised to help him receive assistance if he made the statement.

¶ 18　　In rebuttal, defendant testified that his penis did not make contact with T.V.'s anus on either date.

¶ 19　　The trial court found defendant not guilty of all of the counts[4] related to T.V.'s breast because she had no recollection of defendant fondling her breast. The trial court found defendant guilty on the remaining 56 counts, stating, "there is absolutely no question in my mind that the events alleged in those counts occurred on both the 3rd and 14th of September."

¶ 20　　On September 3, 2009, the trial court merged defendant's convictions into six counts of criminal sexual assault where three counts were for the conduct on September 3, 2007, and three counts were for the conduct on September 14, 2007. The counts provided that defendant was guilty of intentionally or knowingly committing an act of sexual penetration upon T.V. such that defendant's penis, mouth, and finger were used to contact T.V.'s vagina by the use of force or threat of force. Defendant was sentenced to three consecutive six-year prison terms for the incidents on September 3, 2007, and three consecutive four-year prison terms for the incidents on September 14, 2007.

¶ 21　　　　　　　　　　　　　　　　DECISION
¶ 22　　　　　　　　　　　　　I. Failure to Prove *Corpus Delicti*
¶ 23　　Defendant contends the State failed to prove he inserted his finger into T.V.'s vagina on September 14, 2007, because there was no evidence of the offense other than defendant's

---

[4]Counts XLI, XLIII, XLV, XLVII, LIII, LV, LXI, LXIII, LXV, LXVI, LXXI, LXXII, and LXXIII.

own admission. Consequently, defendant argues that the State failed to prove the *corpus delicti* of the offense and, therefore, his conviction must be reversed.

¶ 24    A challenge to the sufficiency of the evidence requires this court to determine whether, when looking at the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 358 Ill. App. 3d 927, 941, 832 N.E.2d 418 (2005). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises reasonable doubt of the defendant's guilt. *Id.* As the trier of fact, the trial court is in the superior position to assess the credibility of witnesses, resolve inconsistencies, determine the weight to assign the testimony, and draw reasonable inferences therefrom. *Id.*.

¶ 25    It is well established that the State must prove the *corpus delicti* of an offense beyond a reasonable doubt. *People v. Lambert*, 104 Ill. 2d 375, 378, 472 N.E.2d 427 (1984). In other words, it is the State's burden to prove beyond a reasonable doubt that a crime occurred. *Id.* The supreme court has said:

> "Proof of *corpus delicti* requires both proof of injury or loss, as well as proof of criminal agency. *** [Citation.] However, the *corpus delicti* cannot be proved by the defendant's confession alone. [Citations.] There must be either some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. [Citation.] If there is such evidence, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*. [Citation.]" (Internal quotation marks omitted.) *Id.* at 378-79.

More recently, the supreme court has added:

> "Although the corroboration requirement demands that there be some evidence, independent of the confession, tending to show the crime did occur, that evidence need not, by itself, prove the existence of the crime beyond a reasonable doubt. If the defendant's confession is corroborated, the corroborating evidence may be considered with the confession to determine whether the crime, and the fact the defendant committed it, have been proven beyond a reasonable doubt." *People v. Sargent*, 239 Ill. 2d 166, 183, 940 N.E.2d 1045 (2010).

¶ 26    Our review of the record demonstrates that during his cross-examination defendant, himself, provided independent, corroborating evidence that he penetrated T.V.'s vagina with his finger on September 14, 2007. We recognize neither Detective Barclay, Nurse Rivera, nor T.V. testified that defendant penetrated T.V.'s vagina with his finger on September 14, 2007; however, we conclude that defendant's testimony sufficiently corroborated his out-of-court admissions to ASA Kross.

¶ 27    The corroboration rule was borne out of a general mistrust of extrajudicial statements. *Id.* "Two reasons are commonly advanced for this mistrust: (1) confessions are unreliable if coerced, and (2) for various psychological reasons, persons 'confess' to crimes either that have never occurred or for which they are not legally responsible." *Id.* The mistrust inherent in extrajudicial statements is not at issue for in-court testimony. During his cross-examination, the State asked defendant a series of questions related to what he admitted in

-7-

his police statements. At that time, the State did not ask whether defendant admitted to the police that he penetrated T.V.'s vagina with his finger on September 14, 2007. However, later in the cross-examination, the State asked defendant a series of questions directed at summarizing the offenses. During that portion of the cross-examination, the following transpired:

> ASA SHEA: Mr. Vaughn, regarding the other time, later in September, around the 14th of September, again, [T.V.] had stayed over at your place, correct?
>
> DEFENDANT: Yes.
>
> ASA SHEA: And you guys were actually going to get contact lenses, correct?
>
> DEFENDANT: Yes.
>
> ASA SHEA: And you fondled her breasts that night, correct?
>
> DEFENDANT: Yes.
>
> ASA SHEA: And you put your finger inside her vagina?
>
> DEFENDANT: Yes."

¶ 28   The record clearly demonstrates the State provided the date at issue and context for that date. Defendant was to answer the questions in relation to the date on which T.V. slept over to get contact lenses, namely, September 14, 2007, and not when she slept over after having gone shopping for school clothes. Notwithstanding, had defendant's testimony been incorrect as to the date at issue, defense counsel was available to clear up the confusion on redirect. No redirect was taken. Accordingly, not only did defendant's testimony corroborate the oral and handwritten statements provided to ASA Kross in which he admitted penetrating T.V.'s vagina with his finger on September 14, 2007, but defendant's in-court testimony provided an independent basis upon which to sustain the conviction. The testimony was available for challenge or clarification and was observed by the trial court. *Jackson*, 358 Ill. App. 3d at 941 (it was the trial court's duty, as the trier of fact, to assess the credibility of the witnesses, resolve any inconsistencies, assign weight to the testimony, and draw reasonable inferences therefrom). The trial court concluded the evidence supported a finding that defendant inserted his finger into T.V.'s vagina on September 14, 2007, and we do not find the evidence was so unreasonable, improbable, or inconsistent to raise a reasonable doubt of defendant's guilt. See *id.*

¶ 29   None of the cases cited by defendant involved situations where the defendant's extrajudicial statement or admission was corroborated by the defendant's testimony at trial. See *Lambert*, 104 Ill. 2d at 379; *People v. Richmond*, 341 Ill. App. 3d 39, 45-46, 791 N.E.2d 1132 (2003); *People v. Wright*, 286 Ill. App. 3d 456, 461, 677 N.E.2d 494 (1996); *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 1003-07, 501 N.E.2d 207 (1986). Our research has not revealed any cases with a similar fact pattern. We conclude defendant's in-court testimony and extrajudicial confession sufficiently established the *corpus delicti* of the offense of digital penetration on September 14, 2007.

¶ 30                       II. Failure to Prove Use of Force or Threat of Force

¶ 31   Defendant contends the State failed to prove he used force or threatened the use of force

while committing the offenses for which he was convicted. With the exception of the conviction discussed prior, defendant does not challenge his guilt as to the remaining acts of sexual penetration. Defendant, however, contends the convictions should be corrected to reflect a different theory of liability, namely, "an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member." 720 ILCS 5/12-13(a)(3) (West 2006). The State responds that the evidence sufficiently demonstrated defendant used force or threatened the use of force while committing the acts of sexual penetration.

¶ 32     As previously stated, when a defendant challenges the sufficiency of the evidence, we consider whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *Jackson*, 358 Ill. App. 3d at 941. It is not the function of this court to retry the defendant or substitute our judgment for that of the trial court. *People v. Ross*, 229 Ill. 2d 255, 272, 891 N.E.2d 865 (2008). The trial court assesses the credibility of the witnesses, resolves any inconsistencies across testimony, assigns weight to the testimony, and draws any reasonable inferences therefrom. *Jackson*, 358 Ill. App. 3d at 941. We will not set aside a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Id.*

¶ 33     For purposes of criminal sexual assault, use of force or threat of force means:

   "(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to exercise that threat; or

   (2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement." 720 ILCS 5/12-12(d) (West 2006).

Our court has elaborated that "[t]here is no definite standard establishing the amount of force which the State is required to prove to show rape. If circumstances show resistance to be futile or life endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." *People v. Bolton*, 207 Ill. App. 3d 681, 686, 566 N.E.2d 348 (1990).

¶ 34     We find the evidence sufficiently demonstrated the use of force or threat of force. T.V. testified that, on both dates at issue, she awoke at night to her father between her legs with his mouth on her vagina. T.V. testified that she was afraid on both occasions. T.V. further testified that, after the first incident, defendant threatened to kill her if she told anyone. T.V. complied and did not inform her friend until after the second incident. At that time, T.V. told her friend that she was afraid to report the incidents to her mother. When she finally told her mother, T.V. was crying. While testifying regarding the incident on September 14, 2007, T.V. stated that she squirmed to avoid defendant's penetrations, but he continued in his attempts. In his handwritten statement, defendant said that, following both incidents, he instructed T.V. not to tell anyone. Defendant admitted in both his handwritten statement and while testifying at trial that, during the second incident, he held his arm around T.V. In total, the evidence clearly shows the 14-year-old girl was overcome by fear and the sheer presence of her father committing the offenses that resistance need not have been established in order

to demonstrate the use of force or threat of force. *Id.*

¶ 35   The instant case is distinguishable from *People v. Vasquez*, 233 Ill. App. 3d 517, 599 N.E.2d 523 (1992), a case cited by defendant for support. In *Vasquez*, this court reversed the defendant's convictions for two instances of criminal sexual assault where the evidence of force was insufficient to sustain those convictions. The relevant facts in *Vasquez* demonstrated that the victim was a 13-year-old foster child who was "forced" to engage in two oral sex acts with the defendant. On both occasions, the defendant pushed the back of the victim's head onto the defendant's erect penis. During the first incident, the victim willingly entered the defendant's car and remained inside after being "forced" to orally pleasure the defendant even when the defendant exited the car to urinate. The victim also allowed the defendant to drive him home. The victim did not attempt to obtain assistance nor report the incident. The victim testified that the defendant did not threaten him and he did not believe the defendant meant him any harm. Several months later, the victim again encountered the defendant and, in an effort to avoid further incidents with the defendant, the victim suggested a location under a bridge or viaduct where they could talk. After again being "forced" to engage in oral sex, the victim remained at the suggested location while the defendant urinated. In addition, the victim did not alert passersby to anything or seek assistance. The victim even followed the defendant to another secluded area behind a bush. *Id.* at 519-29. The *Vasquez* court concluded the victim's testimony that he was "forced" to engage in the oral sex acts was belied by the evidence and that the victim's attempts at resistance would not have been foolish or useless; rather, "such resistance would probably have been successful." *Id.* at 528.

¶ 36   In the case before us, T.V. did not have an opportunity to escape the sexual assaults, which began while T.V. was sleeping; there was no break in the series of offenses. T.V. testified that she was afraid when she awoke to find her father with his head between her legs and his mouth on her vagina. Moreover, defendant positioned himself on top of T.V. while performing the sexual assaults, even using his arm to hold her down at one point. There was no evidence presented that T.V.'s attempts at resistance would have proved successful.

¶ 37   Defendant briefly contends the trial court erred in ruling he was guilty of the same acts of penetration, namely, his mouth, finger and penis to T.V.'s vagina, under the theories of liability that T.V. was "unable to understand the nature of the act" and "unable to give knowing consent." 720 ILCS 5/12-13(a)(2) (West 2006). Defendant argues that T.V.'s age and testimony demonstrate she was able to understand the nature of the acts and that the theory of liability "unable to give knowing consent" is reserved for situations where an otherwise competent person temporarily was incapable of giving consent because the assault occurred while the victim was unconscious, asleep, or severely intoxicated and the acts for which defendant was convicted occurred while T.V. was awake.

¶ 38   In regard to the theory of liability of "unable to understand the nature of the acts," this court has said that merely demonstrating "the victim understood the physical nature of sexual relations is not sufficient to establish that the victim comprehended the social and personal costs involved." *People v. Blake*, 287 Ill. App. 3d 487, 493, 678 N.E.2d 761 (1997). We recognize that this theory of liability is often raised where the victim had a mental impairment; however, we are reminded that the trial court assessed the victim during her

testimony and concluded that she was unable to understand the nature of the sexual acts. See *Jackson*, 358 Ill. App. 3d at 941. T.V. was 14 years old at the time of the sexual assaults and testified that her "daddy" put "his mouth" on her vagina, "took his fingers and put them in [her] vagina," and "penetrated [her] vagina with his penis." Defendant has not demonstrated that, when viewed in a light most favorable to the State, the evidence was so unreasonable, improbable, or unsatisfactory to raise a reasonable doubt as to his guilt that T.V. was unable to understand the nature of the sexual acts.

¶ 39        In regard to the theory of liability of "unable to give knowing consent," this court has said:

> " 'Consent' implies a willingness, voluntariness, free will, reasoned or intelligent choice, physical or moral power of acting, or an active act of concurrence (as opposed to a passive assent) unclouded by fraud, duress, or mistake. [Citation.] The ability to give knowing consent should involve more than measuring complainant's IQ or ability to physically resist defendant. Knowing consent requires us to examine all of the circumstances to see if defendant knowingly exercised such control over complainant that a trier of fact could find that complainant did not submit to the sexual advances of defendant voluntarily, intelligently, and by an active concurrence." *People v. Whitten*, 269 Ill. App. 3d 1037, 1044, 647 N.E.2d 1062 (1995).

There was absolutely no evidence presented that T.V. was able to voluntarily, intelligently, and actively concur with defendant's sexual advances. On two separate occasions, T.V. was awoken to find her father in the midst of the unbroken series of sexual assaults. Defendant has not demonstrated that the evidence, when viewed in a light most favorable to the State, was so unreasonable, improbable, or unsatisfactory to raise a reasonable doubt as to defendant's guilt that T.V. was unable to give knowing consent to the sexual acts.

¶ 40                            III. Ineffective Assistance of Counsel

¶ 41        Defendant contends his counsel was ineffective for failing to file a motion to suppress his inculpatory statements. Defendant argues he invoked his right to remain silent pursuant to *Miranda* and the inculpatory statements resulted from subsequent interrogations in violation of his *Miranda* rights.

¶ 42        To establish an ineffective assistance of counsel claim, the defendant must demonstrate the counsel's representation fell below an objective standard of reasonableness and he suffered resulting prejudice such that there is a reasonable probability that, but for the counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A defendant must overcome the strong presumption that the trial counsel's challenged actions were a matter of sound trial strategy. *Id.* at 689-90. A defendant must satisfy both prongs of the *Strickland* test; however, where prejudice has not been demonstrated, a court need not determine whether the counsel's performance was deficient. *People v. Harris*, 206 Ill. 2d 293, 303, 794 N.E.2d 181 (2002).

¶ 43        "[I]f a defendant takes the witness stand and admits in substance matters contained in a confession or statement he has given the police, this testimony will be considered to have waived or made harmless any error that may have occurred in the admission of the

confession or statement." *People v. Auilar*, 59 Ill. 2d 95, 100, 319 N.E.2d 514 (1974); see also *People v. Schuld*, 175 Ill. App. 3d 272, 282, 529 N.E.2d 800 (1988); *People v. Barr*, 85 Ill. App. 3d 992, 998, 407 N.E.2d 782 (1980); *People v. Villalobos*, 78 Ill. App. 3d 6, 15, 396 N.E.2d 1081 (1979).

¶ 44     Defendant testified to the details of the sexual assaults, confirming the substance of the statements he made to the detectives and ASA Kross. Most notably, defendant testified that he penetrated T.V.'s vagina with his mouth, finger, and penis on both dates at issue. These were the actions for which he was convicted. Moreover, defendant admitted on the stand that the charges were accurate and "most" of what he told ASA Kross was the truth. We are not persuaded by defendant's argument that we should not find waiver or harmless error where he was forced to take the stand because his statements were admitted. Defendant's testimony was inconsistent. He testified that he was convinced to make the statements in order to receive therapeutic treatment; however, he testified consistently with the substance of the sexual assaults. It was the trial court's duty to resolve the inconsistencies, and the court resolved them against defendant. See *Jackson*, 358 Ill. App. 3d at 941. Contrary to defendant's argument on appeal, he never testified regarding the inaccuracies in the statements. Blanket, ambiguous testimony providing that "most" of the statement was correct and that the detectives knew the truth does not demonstrate defendant was obligated to testify. We conclude defendant's testimony waived or made harmless the error, if any, in defense counsel's decision not to file a motion to suppress defendant's statements. Consequently, defendant's ineffective assistance of counsel claim fails.

¶ 45                                   IV. Presence Detention Credit

¶ 46     Defendant finally contends he is entitled to 707 days of presence detention credit. The State contends we should not consider the printed Internet page showing his time in custody that defendant attached to his appellate brief.

¶ 47     A defendant is entitled to receive credit against his sentence for the time spent in custody on the offense for which he was convicted. 730 ILCS 5/5-8-7(b) (West 2006). This court may take judicial notice of the Department of Corrections' records because they are public documents. *People v. Hill*, 408 Ill. App. 3d 23, 32, 945 N.E.2d 1246 (2011).

¶ 48     Defendant was arrested on September 27, 2007, and remained in custody until he was sentenced on September 3, 2009. The State does not challenge these dates nor that defendant remained in custody for that entire period for the offenses on which he was convicted in this case. We, therefore, conclude defendant is entitled to 707 days of presence detention credit. We instruct the clerk of the court to correct defendant's mittimus to reflect the credit.

¶ 49                                          CONCLUSION

¶ 50     We affirm defendant's convictions and sentence. We conclude there was independent evidence supporting defendant's conviction for digital penetration on September 14, 2007. We find the evidence demonstrated defendant used force or threatened the use of force in committing the sexual assaults and that T.V. was unable to understand the nature of the offenses and unable to give knowing consent to the sexual advances. We further conclude

that defense counsel was not ineffective. Finally, we instruct that defendant receive 707 days of presentence detention credit.

¶ 51  Affirmed; mittimus corrected.