NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210030-U

NO. 4-21-0030

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 27, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JEFFREY D. SANFORD, | ) | No. 20CF147 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, holding that the trial evidence was sufficient to
prove beyond a reasonable doubt that defendant committed an act of sexual
penetration with the victim by force.

¶ 2     Defendant, Jeffrey D. Sanford, appeals his conviction for criminal sexual assault.
Defendant contends that the trial evidence was insufficient to prove either that he committed an
act of sexual penetration by the use of force or that the alleged victim was unable to give
knowing consent. We affirm.

¶ 3                          I. BACKGROUND

¶ 4     Defendant was charged by information with two counts of criminal sexual assault
(720 ILCS 5/11-1.20(a)(1), (a)(2) (West 2018)). In count I, defendant was charged with
committing an act of sexual penetration with E.B. when he knew that she was unable to give

knowing consent. In count II, defendant was charged with committing an act of sexual penetration with E.B. by the use of force. Both counts alleged that defendant committed an act of sexual penetration by placing his penis in the mouth of E.B.

¶ 5        At a bench trial, E.B. testified that she called an ambulance on the night of the incident because she was having a nervous breakdown and was considering harming herself. When asked what caused her nervous breakdown, E.B. said: "I think I was uncertain about where my life was at at that time according to my age and things like that, you know. I think it was just a change of life thing." A police officer responded to E.B.'s call, and E.B. told the officer that she was suicidal. An ambulance eventually arrived. There were two individuals in the ambulance, including defendant. E.B. recognized defendant because he had helped her one year earlier when she overdosed. Defendant got into the back of the ambulance with E.B., and the other individual drove the ambulance.

¶ 6        E.B. and defendant both sat on a bench in the back of the ambulance. E.B. told defendant that he looked familiar, and defendant confirmed that he had helped her when she overdosed. Defendant told E.B. that she was pretty. According to E.B., defendant looked E.B. in the eyes and then looked down at his lap. He slowly pushed E.B.'s head down toward his lap and unzipped his pants. E.B. used one of her hands to place defendant's penis in her mouth, and she performed oral sex on him. Defendant ejaculated.

¶ 7        E.B. testified that she performed oral sex on defendant because she felt intimidated and afraid, as defendant was considerably larger than her. E.B. said: "A man opens up his pants, that means to me rape, and I better do it to, to save my own life. I was afraid." E.B. did not recall telling a nurse that she saw a pistol, and she did not remember seeing a pistol. E.B. did not call out for help while she was in the ambulance because she was in shock.

¶ 8        When E.B. arrived at the hospital, defendant's semen was still in her mouth. She pointed to her mouth and motioned to the nurse to get her a cup, but the nurse did not get her a cup. She let some of the semen come out on the sheet, and medical personnel thought she was spitting. E.B. yelled, "[H]e raped me," and medical personnel "knocked [her] out" with some kind of medication. The next thing E.B. remembered was being transported to a different hospital on a stretcher. At the second hospital, a sexual assault examination was performed. E.B. remained in the hospital for one week. She said that she was treated "physically" and received psychiatric medication as well.

¶ 9        E.B. testified that she had only ever seen defendant when she overdosed and on the night of the incident. She did not have any sexual contact with defendant prior to the night of the incident, and defendant never paid her to perform sexual acts on him.

¶ 10        E.B. testified that she was wearing an orange tie-dye "house gown" on the night of the incident. She stated that she had consumed two 12-ounce cans of beer at approximately 4 or 5 p.m. that evening. E.B. did not remember what time she called the ambulance, but other evidence in the case showed that the call was made after 11 p.m.

¶ 11        Two video recordings of E.B. on the night of the incident were later offered into evidence by the defense. The first video was a police officer's body camera footage from before the ambulance crew transported E.B. to the hospital. In the video, E.B. was wearing a white T-shirt and shorts. Defendant made a comment about the condition she had been in the last time he saw her. She asked if he had been the one who was "praying over [her]," and she hugged him.

¶ 12        A video recording of an officer interviewing E.B. at the hospital shortly after the incident was also admitted into evidence. It was difficult to understand E.B. at some points, and she fell asleep at one point during the interview. In the video, E.B. said that when she was in the

ambulance, defendant grabbed her hand and put it on his "man part." E.B. said: "And then [unintelligible] kind of just very slow." She made a motion with her hand as she said this. E.B. then paused. She again said that defendant took her hand and placed it on his "crotch." E.B. said the "transaction" then took place in which she gave defendant oral sex. Defendant ejaculated in her mouth.

¶ 13     The officer asked, "Did he ask you to give him oral sex, or how did that happen?" E.B. said, "He opened up his pants and unzipped them. And uh—that was it. And then I knew." The officer asked, "Did he force you to give him oral sex or did he just kind of indicate that he wanted you to give him oral sex? How did that happen?" E.B. replied, "He indicated that that's what he wanted." The officer asked E.B. if she felt that she had to do it, and she indicated that she did. The officer then asked:

> "[OFFICER]: After he pulled out his penis, did you just give him oral sex? Or did he grab you by the—did he grab your head? Or, what happened to make you think he was wanting oral sex? I mean, obviously, he pulled out his penis, but, what—did he say anything more about it? Or did he—or did you just know what he wanted?
>
> [E.B.]: I just knew what it meant.
>
> [Officer]: Okay.
>
> [E.B.]: [unintelligible]—what the suggestion meant."

The officer asked, "He wasn't grabbing you by the head, forcing—forcing himself on you? You just knew what he was expecting of you?" E.B. said, "Mm hmm." The officer asked E.B. if she wanted to give defendant oral sex, and E.B. said she did not.

¶ 14        Ivey Spenard, a registered nurse, testified that she treated E.B. in the emergency department on the night of the incident. After the paramedic who brought her to the hospital walked away, E.B. told Spenard that the paramedic raped her in the back of the ambulance. Spenard observed that E.B. was holding a substance in her mouth. E.B. asked Spenard to administer a sexual assault kit. Spenard told E.B. that they would have to transfer her to another hospital for that. E.B. became very upset and tried to leave the hospital. They could not let her leave because she was suicidal. E.B. was transferred a few hours later because she had medical problems that needed to be addressed first. Spenard testified E.B. never asked for a cup to spit into.

¶ 15        Sarah Rumbley, a certified sexual assault nurse examiner, testified that she conducted a sexual assault examination on E.B. on the night of the incident. E.B. did not have any injuries related to the sexual assault. E.B. told Rumbley that a paramedic who was taking her to the hospital sexually assaulted her in the ambulance by putting his penis in her mouth. E.B. reported that everything happened very quickly, but she remembered semen being in her mouth. E.B. also said she thought she saw a pistol. Rumbley took oral swabs of E.B.

¶ 16        The parties stipulated that, if called to testify, a forensic scientist would testify that DNA testing of an oral swab taken from E.B. detected the presence of at least two DNA profiles. Defendant could not be excluded as the contributor as to one of the DNA profiles. The statistical frequency of this was 1 in 12 quadrillion at 17 loci.

¶ 17        Brian Kassuelke, an emergency medical technician, testified that he drove the ambulance that transported E.B. to the hospital on the night of the incident. He was able to see into the back of the ambulance at times. He did not notice anything unusual going on in the back of the ambulance.

¶ 18        Robert Derouchie, a sheriff's deputy, testified that he interviewed defendant on the night of the incident and took a sample of defendant's DNA. The interview was recorded on Derouchie's body camera, and the video recording was admitted into evidence. In the video recording, defendant stated that he had contact with E.B. a month earlier when she overdosed. Defendant asked her if she recognized him, and she said yes. Defendant rode in the back of the ambulance with E.B. At the beginning of the ride, defendant and E.B. sat on a bench. Later during the ride, E.B. laid down on the cot. Defendant denied having any sexual contact with E.B.

¶ 19        Tim Beckett, an investigator with the sheriff's department, testified that he interviewed defendant after he received the results of the DNA test. A video recording of the interview was admitted into evidence. In the video, Beckett told defendant that his semen had been found in E.B.'s oral swab. Defendant said that E.B. was a prostitute and that he received oral sex from her on the day of the incident before he went on duty. Defendant paid E.B. 25 dollars, and E.B. was upset that he would not pay her more. Defendant said that he did not tell the police about this the first time he spoke with an officer because he was married. Defendant initially denied having any sexual contact with E.B. in the ambulance. After over an hour of questioning, defendant said that, while he and E.B. were in the ambulance, E.B. groped him, unzipped his pants, and began performing oral sex on him. He ended the encounter after a few seconds. He did not ejaculate. Defendant maintained that he had also had an encounter with her before his shift.

¶ 20        The trial court found defendant guilty on both counts. The court found that E.B.'s story "ha[d] common sense." The court noted that "there were a number of inconsistencies" in E.B.'s statements, but the inconsistencies were "either minutiae or not really relevant to the overall incident." The court noted, for example, the victim testified that she recognized defendant

in the ambulance when the video established she recognized him earlier at the police department, and she testified incorrectly as to what clothing she was wearing. The court stated that it was uncontradicted that E.B. was having a nervous breakdown at the time of the incident and that her emotional state was very delicate. The court also noted that E.B. told someone about the incident as soon as defendant left. The court stated that defendant's story changed multiple times and was inconsistent with the victim's story.

¶ 21　　　　The court found that defendant placed his penis in E.B.'s mouth by the use of force. The court noted that defendant and E.B. were in a confined space inside a moving vehicle during the incident, defendant was larger than E.B., and defendant pushed E.B.'s head toward his penis with his hand. The trial court also found that E.B. was unable to give knowing consent. The court noted that E.B. was upset, having a nervous breakdown, and was suicidal. The court further found that defendant knew this.

¶ 22　　　　Defendant filed a motion to reconsider, arguing (1) he could only be convicted of one count of criminal sexual assault, as both counts were based on the same physical act; (2) the court erred in sustaining one of the State's objections at trial; (3) the evidence did not show that E.B. was unable to consent to sexual relations; and (4) the evidence did not show that he committed an act of sexual penetration by use of force by placing his hand on the victim's head.

¶ 23　　　　The trial court vacated defendant's conviction on count I based on one-act, one-crime principles. The court otherwise denied the motion to reconsider. The court noted that there were some minor inconsistencies between E.B.'s trial testimony and what she told the officer, but it found that her credibility was not so tarnished she could not be believed. The court stated that it had found, under the circumstances, any resistance by E.B. would have been "futile, useless, or foolhardy."

¶ 24        The trial court subsequently sentenced defendant to 13 years' imprisonment. This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26        On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt as to both counts of criminal sexual assault.

¶ 27        We first address defendant's argument that the evidence was insufficient to prove him guilty of criminal sexual assault as charged in count II of the information—namely, that defendant committed an act of sexual penetration with E.B. by the use of force. To prove defendant guilty of criminal sexual assault by the use of force, the State was required to prove that defendant (1) committed an act of sexual penetration and (2) used force or the threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2018). Defendant does not dispute that the State proved beyond a reasonable doubt that he committed an act of sexual penetration by placing his penis in E.B.'s mouth. However, defendant contends that the evidence was insufficient to show that he used force or the threat of force.

¶ 28        Section 11-0.1 of the Criminal Code of 2012 (720 ILCS 5/11-0.1 (West 2018)) provides:

> " 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:
>
> > (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement."

¶ 29    "[T]here is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. "Force does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, which causes the victim to submit to the penetration against their will." *People v. Blom*, 2019 IL App (5th) 180260, ¶ 31. "If circumstances show resistance to be futile or life endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." *People v. Bolton*, 207 Ill. App. 3d 681, 686 (1990). "The question of whether force or threat of force was used is best left to the trier of fact who heard the evidence and observed the demeanor of the witnesses." *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38.

¶ 30    When presented with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 31    Here, viewing the trial evidence in the light most favorable to the State, a rational trier of fact could have found that the evidence established beyond a reasonable doubt that defendant committed an act of sexual penetration by force or the threat of force. E.B. testified that, at the time of the incident, she was in the back of an ambulance on her way to the hospital. She was seeking medical care because she was suicidal and experiencing a nervous breakdown. Defendant, the paramedic who was treating her, was the only other person in the back of the

ambulance with her. Defendant unzipped his pants, exposed his penis, and pushed E.B.'s head toward his lap. The trial court's finding that E.B. was a credible witness was reasonable, as E.B.'s testimony was largely consistent with her statements at the hospital, and E.B. had no motive to fabricate the incident. Accordingly, we defer to the trial court's credibility determination. *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26 ("A trial court's credibility determinations are entitled to great deference, and they will rarely be disturbed on appeal.").

¶ 32    While E.B. did not indicate she resisted performing oral sex on defendant, a rational trier of fact could have concluded that acts of resistance would have been futile under the circumstances. E.B. was confined in a moving vehicle, defendant was the only person in the back of the ambulance with her, defendant was physically larger than her, and she felt intimidated and afraid. See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 ("When considering the evidence of force, we may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred.").

¶ 33    We reject defendant's argument that the trial court's finding that E.B. was credible should not be accorded deference because the trial court incorrectly found that the only inconsistencies between E.B.'s testimony and her prior statements to the police were on minor matters. Defendant contends that E.B. gave inconsistent accounts as to whether defendant physically pulled her head to his lap, which was material to the State's theory of force. However, viewing the evidence in the light most favorable to the State, we find that E.B.'s statements in the video recording were not inconsistent with her trial testimony on this point.

¶ 34    In the video recording, E.B. never stated that defendant did not pull her head toward his lap. The officer asked E.B. whether defendant grabbed her by the head as part of a compound question in which he also asked E.B. what happened to make her think defendant

wanted oral sex, whether defendant said anything more about it, and whether she just knew what he wanted. E.B. responded that she "just knew what it meant." This was not inconsistent with her trial testimony, in which she indicated that defendant demonstrated that he wanted her to perform oral sex on him by slowly pushing her head toward his lap and exposing his penis.

¶ 35 In the video recording, the officer also asked E.B. the following question: "He wasn't grabbing you by the head, forcing—forcing himself on you? You just knew what he was expecting of you?" E.B. replied, "Mm hmm." However, this was also a compound question, and E.B.'s affirmative response was not necessarily inconsistent with her trial testimony. E.B. did not testify at trial that defendant grabbed her by the head and forced his penis into her mouth. Rather, she testified that he slowly pushed her head toward his lap, and she used her hand to put his penis in her mouth.

¶ 36 We also reject defendant's argument that E.B.'s testimony did not show he committed an act of sexual penetration by force because she testified she used her hand to place defendant's penis in her mouth after defendant pushed her head toward his lap. Defendant contends that this conveyed that she was a willing participant in the sexual act. However, viewing the evidence in the light most favorable to the State, E.B.'s use of her hand merely showed a lack of resistance given the attendant circumstances of the confined area and defendant's larger size. See *supra* ¶ 31. As we previously discussed, a rational trier of fact could find that resistance was futile under the circumstances. *Supra* ¶ 32.

¶ 37 We reject defendant's reliance on *People v. Vasquez*, 233 Ill. App. 3d 517 (1992) in support of his position that E.B.'s testimony did not show that he used force to commit an act of sexual penetration. In *Vasquez*, the appellate court reversed the defendant's convictions for aggravated criminal sexual assault, finding there was insufficient evidence that the defendant

used force to place his penis in the 13-year-old victim's mouth on two occasions. *Id.* at 520-23, 529. One of these encounters occurred in the defendant's parked car, and the other occurred in a viaduct under a bridge. *Id.* The *Vasquez* court found that "[t]he only evidence tending to show that force was applied by the defendant during the two oral sex acts with [the victim] was that the defendant placed his hand on the back of [the victim's] head and 'forced' [the victim's] head down onto defendant's penis." *Id.* at 527. The *Vasquez* court further found that, given the evidence presented in that case, acts of resistance on the part of the victim would have probably been successful rather than futile. *Id.* at 528. The court noted that while the victim testified he felt scared during the incident, the victim was not threatened, was not in fear of being harmed, and did not believe the defendant intended to hurt him. *Id.* at 528-29. The court found that, with regard to the encounter in the viaduct, evidence of the victim's behavior belied his testimony that he was forced to engage in the oral sex act. *Id.* at 529.

¶ 38     While *Vasquez* shares some similar facts with the instant case, it does not compel reversal. See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 ("[T]here is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts."). While one of the sexual encounters in *Vasquez* occurred inside a parked car, this was not equivalent to the situation presented in the instant case, where a paramedic exposed his penis to a patient experiencing a nervous breakdown in the back of a moving ambulance and indicated that he wanted her to perform oral sex. Also, unlike in *Vasquez*, E.B. did not testify that she was not in fear of being harmed or that she did not believe defendant intended to hurt her. While the court in *Vasquez* found parts of the victim's testimony not to be credible, we have determined that the trial court reasonably found E.B.'s account of the incident to be credible.

¶ 39        We reject defendant's argument that the State failed to disprove that E.B. consented to oral sex with defendant, which was required because he raised the defense of consent at trial. See *People v. Haywood*, 118 Ill. 2d 263, 274 (1987) ("[I]f the accused raises a question of the consent, the State has a burden of proof beyond reasonable doubt on the issue of consent as well as on the issue of force."). The same evidence that supports our finding that a rational trier of fact could find the State proved beyond a reasonable doubt that defendant committed an act of sexual penetration by force supports a finding that the State disproved that E.B. consented to the act of sexual penetration. See *id.* ("[I]t is obvious that if the prosecution shows that there was an act of sexual penetration by force, that evidence demonstrates that the act was nonconsensual. To prove the element of force is implicitly to show nonconsent.").

¶ 40        Because we have found that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of criminal sexual assault as charged in count II of the information, we need not consider whether the evidence was sufficient to prove defendant guilty of criminal sexual assault as charged in count I of the information, as that conviction was vacated based on one-act, one-crime principles.

¶ 41                              III. CONCLUSION

¶ 42        For the reasons stated, we affirm the trial court's judgment.

¶ 43        Affirmed.